ACHSAH LARISON et al.

*v.*

SARAH POLHEMUS et al.

1. In case a father enters into a parol agreement with two of his sons that if they will take charge of his farms and earn for him a given sum, he will then give up the farms to them; and they take charge and earn the sum named, and thereafter, until the father's death, by his consent, retain all the issues and profits, the taxes on the farms being assessed to him in their presence, no foundation is laid for a decree in favor of the said sons against the other heirs-at-law of the father to convey said farms.

2. In such case, the alleged agreement being with both respecting the same subject-matter, the result of which they were mutually and equally interested in, they cannot testify in behalf of each other as to transactions with or statements by the intestate.

On bill and cross-bill.

*Mr. W. H. Vredenburgh* and *Mr. B. Gummere,* for complainants.

*Mr. G. C. Beekman* and *Mr. James Wilson,* for defendants John and George W. Polhemus.

BIRD, V. C.

Tobias Polhemus died in 1879, intestate. His widow survived him, so did his children, Achsah Larison, Maria Hendrickson, George W. and John; also Emma Terhune and Nettie Havens, children of his daughter, Mary Forsyth; and Ellen Nelson, Tobias Polhemus and William H. Polhemus, children of his son Henry. In this case the bill was filed for the partition of several tracts of land of which the father died seized. To this bill two of the sons, George W. and John, have filed an answer, denying the right of the complainant or any of the other defendants to any interest in two large tracts of the land named in the bill, one containing one hundred and fifty-nine acres and the other one hundred and eighty-eight acres, and claiming title thereto in themselves. Afterwards a cross-bill was filed in support of the answer.

The allegation is that, once in 1865 and once within two years thereafter, their father and they, George W. and John, agreed that they should work and manage said two tracts of land, and that when their earnings amounted to $12,000 then John should have the farm known as the "Croft farm," on which the father and both sons then lived, and George should have the Hendrickson farm, which in 1865 the father did not own; the plain meaning of which was, supposing there was such an agreement, that the sons were to work for their father until they had earned for him the sum of $12,000, and then they were to have the farms.

The alleged agreement was by parol, but the insistment is that there was such part performance as to take the case out of the statute. The complainants in the original bill deny that there ever was any such agreement, and contend that, if there was one, it was illegal.

Has any agreement been established? The language employed in the answer to express the agreement is:

"That heretofore, and about the year 1865, the said intestate entered into a certain agreement with the said defendants, his sons, whereby they respectively agreed that as soon as their earnings amounted to $12,000, and that sum was invested at interest in the name of the intestate, so that said intestate and his wife would have enough to live on, that he, the said intestate, would, in consideration thereof and of their earnings heretofore by them made and from time to time applied to his use, convey to them by good and sufficient deeds in fee simple, the said Croft farm to this defendant, John Polhemus, and the said Hendrickson farm to this defendant, George W. Polhemus."

To establish this allegation the defendants have both been sworn. It is conceded that no person except the father and sons had any knowledge of the agreement, unless it may be such as shall be gathered or inferred from fragments of conversations or remarks of the father made several years afterwards. So far as the evidence of the sons related to any transactions with or statements by their father, it is objected to. The provisions of the act of 1880 were invoked to sustain this objection. I think the objection should prevail. See *Smith* v. *Burnet, 7 Stew. Eq. 219,* and the same case on appeal, *8 Stew. Eq. 314,* in which the opinion of the chancellor is unanimously affirmed. *Besson* v. *Cox, 8 Stew. Eq. 87.*

It is, however, insisted that John can speak in George's interest and George in John's, notwithstanding the transactions and statements in which they were both interested occurred at the same time. In my judgment the spirit which prompted the proviso in the act includes this offer, and that the testimony cannot be considered. It was only one contract; the father on one side and the sons on the other. When, in 1865, the agreement was made, the father only owned the Croft farm. Surely they could not speak for each other then. The title to the Hendrickson farm was acquired by the father about two years later; and no other change in the agreement is intimated than that George was to have that farm and John the Croft farm. It is still the same agreement between the father and his sons. If this insistment should prove tenable, the statute would always be unavailing in case there should be two or more parties to one side of an agreement, who should survive and their interests thereunder were divisible. But most manifestly all the temptations to perjury

would remain. The witness cannot affirm the contract as to the other parties without affirming it as to himself. I fear that such a construction would open the way for combinations and conspiracies against the estates of decedents quite too difficult for the most vigilant to unravel or expose.

The evidence of John and George being rejected, what proof is there of the agreement? David M. Newman says that during an interview with Tobias in the year 1878, he said "he had given up everything to the boys." This, of course, is very comprehensive and would include his other lands, and his personal estate as well. John Niveson says that he called on Tobias in 1878, and found him in the garden with John, and heard him say to John, "You have planted this truck to suit yourself; you have got to attend to it to suit yourself; I don't calculate to do anything in the garden at all this season; I have given all up to you, now go ahead and do as you please." Patrick McGown says that in 1872 Tobias said to him with reference to the Hendrickson farm, "that he had that property fixed up pretty nice now, and that he expected that George was going to get married; he was going to let him have it." Robert Niveson says that he heard the intestate in 1878 say to John "that he had given up everything to him, and he could do as he pleased." In 1876, James Powell heard him say "he was going to give up everything to John; he said he had enough for him and the old lady to live on; that farm there John was to have—he had always stayed home and worked hard." Daniel B. Norton heard him say that "he had a farm apiece for each of his boys." He told Robert Kirby that he wanted a farm for of each his boys.

I think the testimony most relied upon in behalf of the sons was that of George Beatty. He says in the year 1878 the intestate asked him to take a ride with him, which he did, and that while on the way the old gentleman said, "he wanted to fix his business up; he said he had contracted with his boys that if they would make him $12,000 he would give up the farms to them; he said they had fulfilled their contract and he wanted to fulfill his; he said he had the papers in his pocket by which he wanted the matter fixed." The witness says that the intestate

was going to Robert Miller's then to get the matter fixed, but that Miller was not at home. Afterwards he adds " he was going to have them fixed for the boys to have the farms, somewhere near that." This witness admitted that he had told a different story about this interview when under oath on another occasion, which seems to render it quite impossible to rely implicitly on his statements.

The sons having worked on the Croft farm from 1865, and on the other from 1867 to the year 1878, and having given all the net proceeds to their father after making all such improvements as they chose, it is now contended that the evidence above recited brings the case within the rule laid down in *Johnson* v. *Hubbell*, *2 Stock. 332*, and in *Davison* v. *Davison, 2 Beas. 246*, and in *Van Dyne* v. *Vreeland, 3 Stock. 370 ; S. C., 1 Beas. 142*. I think there was a very much greater degree of certainty in the alleged agreement in each one of those cases. In this it is quite impossible to determine what was meant by the phrase, " The boys are to have the farms," or other similar ones. In those there was such distinct part performance of a definite contract, or such an emphatic recognition of one on one side and such part performance on the other, as not to leave any alternative to the court. In this, taking the legitimate and reliable testimony to guide, what part performance has there been, or what recognition of a contract which the court could base a decree for specific performance upon ? In *Davison* v. *Davison*, the parol contract was clearly established. The principal feature of it had been expressed by the party sought to be charged in his last will, and its purpose delared by him. In this, the only admissible evidence of any agreement ever having been made is that of George Beatty, who says that the intestate told him that he had contracted with the boys that if they would make him $12,000 he would give up the farms to them, and that they had fulfilled their contract and he wanted to fulfill his; which is greatly qualified by the fact that when speaking of this same interview many months before, and in point of time much nearer the event, his language was : " He told me he had given up to John and George everything, both the stock and places," in which not

a word appears respecting a contract. I certainly cannot escape the conviction that if a communication had been made by the old man, containing the expressions which Beatty claims in the former were made to him, he would first of all remembered them when called upon. They would not have lingered to the spur of an afterthought. Without Beatty's story there is no evidence whatever in the case of any contract between the father and his sons about the farms or any other subject-matter. Courts do not rest their judgments and decrees upon such testimony. In the case of *Van Dyne* v. *Vreeland* the parol agreement set forth was so completely proved as to baffle all doubt. The part performance, too, year by year, was established to the letter and spirit of the contract.

I am not satisfied that the proof in this case thus far considered brings it within any of the adjudications presented to me.

However, the defendants John and George do not rest at this stage. They insist that a true understanding of their father's expressions, such as "give up to the boys," or "I have given up," can only be arrived at by considering the many years of patient toil and care bestowed by the sons on the lands of the father. John resided with his father and worked at least twelve years on the Croft farm, surrendering everything to his father beyond repairs and some valuable improvements. In 1867 the Hendrickson farm was purchased. George remained at home until 1872, assisting John on the Croft farm until the purchase of the Hendrickson farm, and then taking control of that. Having married in 1872, he has resided on the Hendrickson farm with his family until the present time. That this work was done, is not convincing evidence of an agreement to convey the farms.

Moreover, what was said and done by the father and sons leads me to conclude that there never was a contract to convey, and that the court, in refusing the prayer of the cross-bill, does no injustice whatever to the complainants therein. If, as the court believes, they proceeded on an imperfect understanding, it cannot be expected that this court will supply or bridge over the deficiencies. And yet, while I believe there was no contract to

convey, I think there was one to the effect that if the sons would
earn from the management of those farms a certain amount of
money for the father, he would then give up the farms to them ;
he would give up to them the rents, profits and income.   This
he did ; at least the sons so swear.   And this is very strictly in
harmony with the father's declarations, when he said he "had
given up everything to John," and that he was "going to let
George have the Hendrickson farm," and the like.  So far, there-
fore, as the evidence establishes anything, it is that the father,
in the sense above indicated, gave up the farms to the sons
about a year before his death.   During that last year there is no
evidence that they paid to him any of the rents, or that they
accounted for any of the profits, except some money for taxes.
And this view of the situation the sons accepted.   There is not
a particle of proof to show when the father said to John in the
garden in the presence of witnesses, "Now, I have given up all
to you, you can do as you please," that John objected to that
manner of giving up, and demanded a deed for the farm.   Nor
is there any proof that during that last year either of the sons
demanded anything more of their father by way of confirming
their claims than what was signified in his "giving up" to them
the rents and profits.   After he had thus "given up," the sons
allowed the farms to be assessed to their father, a very convinc-
ing circumstance against their present contention.   At the same
time they were each assessed for their personal property, valued
at $1,000.   In allowing the farm to be assessed to their father,
because he still held the legal title, it afforded to them a most
favorable opportunity to insist upon a transfer of the title, if the
father had ever promised to do so.

Besides all this, it looks as though the sons well understood,
also, that they were to take their chances for compensation for
their labor out of the profits of the farm, after they had
earned the amount specified.   Their father was aged, and a
long time before his death, very sick and feeble, yet there is no
proof that they ever demanded a deed for the farms, or ever in-
sisted upon any other recognition of their claims than a surren-
der to them of the rents and profits.   In addition to this, after

Larison v. Polhemus.

the death of the father, John said in the hearing of the witness S. S. Nelson, that if his father had made a will he was going to leave him the Croft farm, but as there was no will he supposed he would have to come in equal with the rest. In this, Nelson is supported by Henry Larison and P. K. Forsyth. Up to this time I believe there was no claim made that his father had agreed to convey the farm. I understood Charles Nelson as saying that he heard George make a similar remark to the one above made by John, adding, " Yes, it was the intention for us to have the farms had he made a will." Such statements seem to be wholly inconsistent with the allegations in the answer and cross-bill, that their father had agreed to convey the farms to them.

I think that the prayer of the cross-bill that the defendants therein be decreed to convey all their interest in the Croft farm to John and in the Hendrickson farm to George, should be denied, and will advise accordingly.

The senior counsel of John and George, at the close of his argument, for the first time, urged the court to give to them compensation for their labor in case of judgment against them on the other question. The complainants in the cross-bill were given the opening and reply, and consequently the other side had no notice of such asking until the close of the case; both counsel having addressed the court, and one of them at the time referred to being absent, they did not speak to this point; nor, indeed, had they any opportunity to. This of itself forbids all inquiry, except so far as to observe the embarrassments of John and George, should their cross-bill be dismissed, and it were afterwards to appear that they have a just and equitable claim, and also the apparent insufficiency of the testimony now before the court to found a decree upon. Therefore, with a view of finally settling this branch of the case also, the counsel for the complainants in the cross-bill are at liberty to open the matter to the court at an early day, that steps may be taken to give counsel for the defendants therein an opportunity of being heard. In the meantime, there is no necessity to stay proceedings on the original bill.